IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL W. UNDERWOOD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 13 C 5687 |
| CITY OF CHICAGO, a Municipal | ) | |
| Corporation, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiff Michael W. Underwood and more than 300 other named plaintiffs (collectively "Plaintiffs"), who are each alleged to be "a participant in one of the four City of Chicago Annuity and Benefit Funds" (Dkt. No. 1-1, ¶ 15), filed this lawsuit on July 23, 2013 in the Circuit Court of Cook County, Illinois Chancery Div. No. 2013 CH 17450. Defendant City of Chicago ("City") timely removed the case to this court on August 9, 2013. (Dkt. No. 1.)

On October 2, 2013, this court granted (Dkt. No. 21) Plaintiffs' motion for leave to file an amended complaint (Dkt. No. 13).[1] Plaintiffs' Amended Complaint (Dkt. No. 55) alleges in five counts that the City's announced discontinuance of health care benefits for Plaintiffs on December 31, 2013: (1) violates the 1970 Illinois Constitution (Count I); (2) breaches the City's contractual obligation to provide Plaintiffs with health care benefits (Count II); (3) is prohibited

---

[1] No amended complaint was subsequently filed by Plaintiffs. After waiting two months for Plaintiffs to file their amended complaint as a separate entry in the record, the court on December 9, 2013 asked the Clerk to file Plaintiffs' attachment to their motion (Dkt. No. 13-1) as a separate entry. The Clerk obliged and filed the attachment (Dkt. No. 13-1) in the record for Plaintiffs, as Plaintiffs' Amended Complaint (cited as "Am. Compl.") (Dkt. No. 55).

on grounds of equitable estoppel (Count III); (4) is a deprivation of Plaintiffs' property rights actionable under 42 U.S.C. § 1983 (Count IV); and (5) violates the Contracts Clause of the United States Constitution (Count V).

On October 10, 2013, the City filed a motion to dismiss (Dkt. No. 28) each of the five counts in Plaintiffs' Amended Complaint on the grounds that Plaintiffs had not stated a basis upon which relief may be granted. The court allowed the parties time to present their legal reasoning and arguments. The issues now have been fully briefed, and for the reasons explained below, the City's motion to dismiss is granted.

## FEDERAL SUBJECT MATTER JURISDICTION

In Counts IV and V of Plaintiffs' Amended Complaint, Plaintiffs purport to bring their claims under federal law and the United States Constitution. Consequently, the court's jurisdiction as to those claims arises under 28 U.S.C. § 1331. The court has supplemental jurisdiction over Plaintiffs' claims in Counts I, II, and III pursuant to 28 U.S.C. § 1367. Plaintiffs' claims in Counts I, II, and III are so related to Plaintiffs' federal claims, Counts IV and V, that they form part of the same case or controversy under Article III of the United States Constitution.

## FACTUAL BACKGROUND[2]

I.  Early History of the City's Health Care Plan

The four "City of Chicago Annuity and Benefit Funds" (Am. Compl. ¶ 15)—the Policemen's Annuity and Benefit Fund of Chicago ("Policemen's Fund"), Firemen's Annuity

---

[2]  The court in ruling on the City's motion has accepted the allegations in Plaintiffs' Amended Complaint as true. The facts recited in this opinion are based on the allegations in Plaintiffs' Amended Complaint. (Dkt. No. 55.)

and Benefit Fund of Chicago ("Firemen's Fund"), Municipal Employees', Officers', and Officials' Annuity and Benefit of Chicago ("Municipal Fund"), and Laborers' and Retirement Board Employees' Annuity and Benefit Fund of Chicago ("Laborers' Fund") (collectively, the "Pension Funds")—are named, along with the City, as defendants in Plaintiffs' Amended Complaint.[3] (*Id.* ¶¶ 16-17.) The Pension Funds were created and operate under the authority of Articles 5, 6, 8 and 11 of the Illinois Pension Code, 40 Ill. Comp. Stat. 5 (the "Pension Code"), to provide for and administer pension benefits for certain retired employees of the City. (Am. Compl. ¶ 17.)

Since 1964, annuitants of the Pension Funds have been entitled to participate in the City's employee group health care plan. (*Id.* ¶ 21.) The City's health care plan is self-funded and administered on a "claims made" basis, which means that the City appropriates money and pays claims itself rather than obtaining insurance coverage from a third-party provider. (*Id.* ¶ 21.) In 1982, as a "result of a 'handshake' agreement between the City's Byrne administration, the Police and Fire Unions and/or Funds trustees," the City agreed to provide health care coverage to annuitants of the Policemen's and Firemen's Funds. (*Id.* ¶ 26.) The monthly premiums for the coverage were to be fixed at $55 for annuitants who had not qualified for Medicare and $21 for Medicare-qualified annuitants, and were to be subsidized by the Policemen's and Firemen's Funds. (*Id.*) Later that year, the Illinois General Assembly (the "General Assembly") amended the Pension Code to codify the "handshake" agreement discussed above. (*Id.* ¶¶ 26-27.)

---

[3] No return of process demonstrating that the Pension Funds have been served with any complaint in this case appears in the court record.

3

The Pension Code legislation required the Policemen's and Firemen's Funds to contract with one or more carriers to provide health insurance for all annuitants, and to subsidize annuitants' monthly insurance premiums by contributing up to $55 per month for annuitants who were not qualified for Medicare and $21 per month for Medicare-qualified annuitants. (Am. Compl. ¶ 33.). The legislation further required the City to levy a special tax to finance the monthly premium subsidies. (*Id.* ¶¶ 26, 31.) If the monthly premiums of the chosen plan exceeded the maximum amount of the subsidies, the Pension Code required that the additional cost be deducted from an individual's monthly annuity. (*Id.* ¶ 33); s*ee also* 40 ILCS § 5/5-167.5; 40 ILCS § 5/6-164.2 (added by P.A. 82-1044, § 1, eff. Jan. 12, 1983). Because the subsidies were equal to the $55/$21 premiums charged by the City's health plan, and because the City agreed to fix those premiums at $55/$21 (Am. Compl. ¶ 26), an annuitant of the Policemen's or Firemen's Funds could "rely on adequate healthcare for life at no net cost to the annuitant." (*Id.* ¶ 34.)

In 1985, the General Assembly passed similar legislation requiring the Municipal and Laborers' Funds to subsidize up to $25 of annuitants' monthly health care premiums. (Am. Compl. ¶¶ 35, 36); *see also* 40 ILCS § 5/8-164.1 (added by P.A. 84-23, § 1, eff. July 18, 1985); 40 ILCS § 5/11-160.2 (added by P.A. 84-159, § 1, eff. Aug. 16, 1985). This legislation directed the Municipal and Laborers' Funds to approve a group health insurance plan for their annuitants. (Am. Compl. ¶ 36.) The legislation further directed the Municipal and Laborers' Funds to make payments up to $25 per month to the organization—in this case, the City—underwriting the health care plan. (*Id.* ¶¶ 36, 43.) Additionally, the legislation stated that the health care plans were not to be construed as pension or retirement "benefits" under Article XIII, § 5 of the 1970 Illinois Constitution. (*Id.* ¶ 37.)

In addition to the legislation, Plaintiffs allege that the City, between 1984 and 1987, promised its employees and retirees health care coverage "for life at no cost" through the City's health care plan. (*Id.* ¶ 47.) The City allegedly prepared and distributed a booklet advising annuitants of their rights, benefits, and the terms of the City's annuitant health care plan. (Am. Compl. ¶ 44.) Plaintiffs further allege that the City held a series of "Pre-Retirement Seminars" in which City officials told City employees that their various retirement benefits included free lifetime health care, and that they would only have to pay extra money to cover their spouses and dependents. (*Id.* ¶¶ 45-47.) Notwithstanding the City's alleged promise of free health care for *all* annuitants, Plaintiffs allege that "it became widely understood among City employees" that only Police and Fire annuitants would enjoy no out-of-pocket premium cost (*Id.* ¶ 48); Municipal and Laborers' annuitants expected only to receive a $25 subsidy toward their monthly premiums. (*Id.*)

II. The Korshak Litigation and Settlement

Although the cost of health care coverage rose during the 1980s, monthly premiums for annuitants of the Pension Funds remained at the $55/$21 levels. (*Id.* ¶¶ 67-69.) In October 1987, following unsuccessful attempts to raise annuitants' premiums, (*Id.* ¶¶ 76-79), the City notified all four of the Pension Funds that it intended to terminate annuitant health care coverage by January 1, 1988. (*Id.* ¶ 89.) The City also filed suit seeking to terminate the coverage and to force the Pension Funds to reimburse the City the $58 million it had spent on annuitant health care coverage through September 1987. (*Id.* ¶ 91); *City of Chicago* v. *Korshak*, Circuit Court of Cook County, Illinois Chancery Div. No. 87 CH 10134 (the "Korshak Litigation"). The Pension Funds filed counterclaims to force the City to continue unchanged its health care coverage for annuitants. (*Id.* ¶¶ 93-94.) A group of annuitants then moved to intervene to protect the interests

5

of individual retirees (the "Korshak Intervenors"). (*Id.* ¶ 92.) The Circuit Court of Cook County ("State Court") granted their motion and designated the Korshak Intervenors as representatives for a certified class of annuitants who had retired on or before December 31, 1987. (*Id.* ¶¶ 92, 102.) This group of plaintiffs, also appearing in this case, is referred to as the "Korshak" subclass. (*Id.*)

In 1988, the State Court dismissed the City's complaint with regard to a refund of alleged overpayments, but proceeded to conduct a bench trial to adjudicate the City's prospective obligations, if any. (*Id.* ¶¶ 10, 94.) Before the State Court issued a ruling, however, the City and the Pension Funds reached a settlement agreement that relied upon certain amendments to the Pension Code. (*Id.* ¶¶ 11, 95-96.) The resulting legislation increased the amount the Pension Funds would contribute to the annuitants' monthly premiums, required the City to pay at least 50 percent of the cost of the annuitants' health care coverage through 1997, and made the annuitants responsible for paying the remaining portion of their premiums. (*Id.* ¶ 11); 40 ILCS § 5/5-167.5(d),(e); 40 ILCS § 5/6-164.2(d),(e); 40 ILCS § 5/8-164.1(d),(e); 40 ILCS § 5/11-160.1(d),(e) (as amended by P.A. 86-273, § 1, eff. Aug. 23, 1989). If the parties failed to reach a permanent agreement by December 31, 1997, the parties would be permitted to assert whatever legal rights existed before the Korshak Litigation commenced. (Am. Compl. ¶ 12.); *see also City of Chicago* v. *Korshak*, 206 Ill. App. 3d 968, 971, 565 N.E.2d 68, 70 (Ill. App. Ct. 1st Dist. 1990) (approving the settlement agreement). The legislation also stated that the agreed upon health care benefits were not to be construed as pension or retirement benefits for purposes of Article XIII, § 5 of the 1970 Illinois Constitution. *See* 40 ILCS § 5/5-167.5(f); 40 ILCS § 5/6-164.2(f); 40 ILCS § 5/8-164.1(f); 40 ILCS § 5/11-160.1(f) (as amended by P.A. 86-273, § 1, eff. Aug. 23, 1989).

6

III.    <u>Interim Settlements</u>

In June 1997, six months before the Korshak Litigation settlement was set to expire, the City and the Pension Funds negotiated a new agreement to extend annuitant health care coverage through June 30, 2002 (the "1997 Agreement"). (Am. Compl. ¶ 97); s*ee also Ryan* v. *City, et al.*, Ill. App. Ct. Nos. 1-98-3465 and 1-98-3667 (Ill. App. Ct. 1st Dist. 2000) (Dkt. No. 15-3, pp. 4-5.) The 1997 Agreement, codified in amendments to the Pension Code, modestly increased the Pension Funds' monthly premium contributions and again required the City to cover 50 percent of the health care costs of annuitants. *See* 40 ILCS § 5/5-167.5(d),(e); 40 ILCS § 5/6-164.2(d),(e); 40 ILCS § 5/8-164.1(d), (e); 40 ILCS § 5/11-160.1(d),(e) (as amended by P.A. 90-32, § 5, eff. June 27, 1997). The Korshak Intervenors, however, challenged the 1997 Agreement, claiming that the City and the Pension Funds had not reached a "permanent solution" as required by the original settlement in the Korshak Litigation. (Am. Compl. ¶ 13; Dkt. No. 15-3, pp. 4-5.) The Illinois Appellate Court ruled in favor of the Korshak Intervenors and remanded the case back to the Circuit Court of Cook County. (Dkt No. 15-3.) The City, the Pension Funds, and the Korshak Intervenors negotiated a second interim settlement agreement, under which the City agreed to provide a health care plan for retirees through June 30, 2013 (the "2003 Agreement"). (Am. Compl. ¶ 97); *see also City of Chicago* v. *Korshak, et al.*, Circuit Court of Cook County, Illinois Chancery Div. No. 01 CH 4962 (order dated July 31, 2003) (approving the 2003 Agreement).

Like the previous settlement agreements, the 2003 Agreement was codified by legislation amending the relevant provisions of the Pension Code. *See* 40 ILCS § 5/5-167.5(b); 40 ILCS § 5/6-164.2(b); 40 ILCS § 5/8-164.1(b); 40 ILCS § 5/11-160.1(b) (as amended by P.A. 93-42, § 5, eff. July 1, 2003). The 2003 Agreement required the City to pay at least 55 percent of health care

costs for those annuitants who retired before June 30, 2005. (*Id.*) For annuitants who retired after that date, the City covered 40-50 percent of health care costs depending on the annuitant's length of service. (*Id.*) The City did not, however, pay any share of the health care costs for annuitants with less than ten years of service. (*Id.*) The Pension Funds also continued to make fixed monthly contributions for each annuitant. Between July 1, 2003 and July 1, 2008, the Pension Funds contributed $85 for each annuitant who was not qualified for Medicare, and $55 for each annuitant who was qualified for Medicare. After July 1, 2008, the Pension Funds' obligations increased by $10 per month for all annuitants. (*Id.*)

Like the earlier Pension Code amendments, each of the 2003 amendments contained a provision stating that the agreed upon health care benefits were not to be construed as pension or retirement benefits for the purposes of Article XIII, § 5 of the 1970 Illinois Constitution. *See* 40 ILCS § 5/5-167.5(c); 40 ILCS § 5/6-164.2(c); 40 ILCS § 5/8-164.1(c); 40 ILCS § 5/11-160.1(c) (as amended by P.A. 93-42, § 5, eff. July 1, 2003).

IV.   <u>The Present Case</u>

In May 2013, the City sent a notice to retirees advising them of the City's plans for health care coverage after the expiration of the 2003 Agreement. (Am. Compl. ¶ 98; *see also* Dkt. No. 55-2.) First, the City voluntarily extended current coverage and benefit levels for all annuitants through December 31, 2013. (Dkt. No. 55-2 ¶ 1.) Second, for annuitants who retired before August 23, 1989, the City plans to provide a health care plan and pay 55 percent of the costs associated with that plan for the lifetimes of annuitants. (*Id.* ¶ 2.) Third, for annuitants who retired on or after August 23, 1989, the City plans to terminate its health care plan and associated subsidies by the beginning of 2017. (*Id.* ¶ 3.) Effective June 28, 2013, the General Assembly amended the Pension Code to require that the Pension Funds continue to subsidize retiree health

8

care coverage at the same level prescribed under the prior provisions, but only until "such time as the [C]ity no longer provides a health care plan for such annuitants or December 31, 2016, whichever comes first." (Am. Compl. ¶ 99); 40 ILCS § 5/5-167.5(b); 40 ILCS § 5/6-164.2(b); 40 ILCS § 5/8-164.1(b); 40 ILCS § 5/11-160.1(b) (as amended by P.A. 98-43, § 5, eff. June 28, 2013).

With respect to the litigation pending before this court, Plaintiffs' counsel originally filed a motion to revive the original Korshak Litigation in the State Court. (Am. Compl. ¶ 4.) The State Court denied the motion, ruling that Plaintiffs would instead have to file a new action. (*Id.*) Plaintiffs filed a new action in the State Court, the City removed the case to this court, and Plaintiffs requested leave to file their Amended Complaint on September 17, 2013. (*See* Dk. Nos. 1, 13.) The Amended Complaint (Dkt. No. 55) identifies four purported subclasses of plaintiffs:

1. Participants who retired on or before December 31, 1987 (the "Korshak" subclass);

2. Participants who retired after December 31, 1987 and before August 23, 1989 (the "Window" subclass);

3. Participants who began contributing to any of the Pension Funds before August 23, 1989, including active employees; and

4. Participants who began contributing to any of the Pension Funds after August 23, 1989, *i.e.*, any new hire.

(*Id.* ¶ 7.)

Plaintiffs seek three remedies: (1) a declaration that the Korshak and Window subclasses are entitled to a fixed rate, fully subsidized health care plan as it existed in 1982, *i.e.*, fixed monthly premiums of $55/$21 to be paid entirely by the Pension Funds (through a City tax); (2) a declaration that the past and current provisions of the Pension Code, which expressly state that health care benefits are not to be construed as pension or retirement benefits, are invalid; and (3)

an injunction prohibiting the City from reducing the health care benefits provided to class members from the most favorable level provided during the class members' employment by the City. (Am. Compl. Prayer for Relief, p. 32.)

The court now turns to address the City's motion to dismiss. (Dkt. No. 28.) Plaintiffs' Amended Complaint contends that the City's plan to discontinue health care benefits for retirees (1) violates the 1970 Illinois Constitution, (2) breaches the City's contractual obligation to provide Plaintiffs with health care benefits, (3) is prohibited on grounds of equitable estoppel, (4) is a deprivation of Plaintiffs' property rights actionable under 42 U.S.C. § 1983, and (5) violates the Contracts Clause of the United States Constitution. As noted earlier, for the purpose of addressing the City's motion, the court, as is required, accepts Plaintiffs' Amended Complaint's allegations as true, and considers only those allegations, along with any materials attached to, referenced in, or integral to the allegations of Plaintiffs' Amended Complaint. *Cole* v. *Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 903 (7th Cir. 2011) (citing *Thompson* v. *Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753-55 (7th Cir. 2002)).

<u>LEGAL STANDARD</u>

Under the Federal Rules of Civil Procedure, a complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley* v. *Gibson*, 355 U.S. 41, 47 (1957)). Although "detailed factual allegations" are not required, plaintiffs must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. The complaint must "include sufficient facts 'to state a claim for relief that is plausible on its face.'" *Cole*, 634 F.3d at 903 (7th Cir. 2011)

(quoting *Justice* v. *Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). In ruling on a Rule 12(b)(6) motion, the court "construe[s] the . . . [c]omplaint in the light most favorable to Plaintiff, accepting as true all well-pleaded facts and drawing all possible inferences in his favor." *Cole*, 634 F.3d at 903.

## ANALYSIS

As stated earlier, the City has moved to dismiss all of Plaintiffs' claims. For the reasons set forth below, the City's motion to dismiss is granted.

I.   Plaintiffs' Illinois Constitutional Claim (Count I)

Article XIII, § 5 of the 1970 Illinois Constitution (the "Pension Clause")[4] provides that:

> Membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired.

Ill. Const. Art. XIII, § 5. Plaintiffs argue that health care benefits are "benefits" within the protection of the Pension Clause. Consequently, according to Plaintiffs, the Pension Clause bars the City from reducing health care benefits—including coverage levels, premiums, deductibles, and City subsidies—below the most favorable terms provided during an individual's employment, *i.e.*, diminishing or impairing health care benefits. Plaintiffs also contend that the statutory provisions governing the terms of coverage, which expressly state that health care

---

[4]   The Supreme Court of Illinois has referred to Article XIII, § 5 of the 1970 Illinois Constitution as the "pension protection clause," s*ee, e.g.*, *People ex rel. Sklodowski* v. *State of Illinois*, 182 Ill. 2d 220, 224, 695 N.E.2d 374, 375 (Ill. 1998). For the sake of brevity, this court will refer to the provision as the "Pension Clause."

benefits are not to be construed as pension or retirement benefits, are unconstitutional insofar as they unlawfully carve out a constitutionally protected benefit. The City argues that health care benefits are not "benefits" within the meaning of the Pension Clause, and thus not entitled to constitutional protection against diminution.

The question of whether health care benefits are within the protection of the Pension Clause has not yet been addressed directly by the Supreme Court of Illinois. In fact, only one court in Illinois, the Circuit Court for the Seventh Judicial Circuit, Sangamon County, Springfield, Illinois, has ruled on the issue. It did so on March 19, 2013 in *Maag* v. *Quinn*, Case No. 2012 L 162 (Dkt. No. 34-2).[5] That case is currently pending before the Illinois Supreme Court on direct appeal.[6]

---

[5] Plaintiffs argue that other "Illinois lower courts have held that the [Pension Clause] *does* extend to protect healthcare benefits, as well." (Dkt. No. 49, p. 10 emphasis original). In support of their argument, Plaintiffs cite *Marconi* v. *Joliet*, 2013 IL App (3d) 110865, 989 N.E.2d 722 (Ill. App. Ct. 3d Dist. 2013). In *Marconi*, the Illinois Appellate Court reversed an unpublished order by the Circuit Court for the Twelfth Judicial Circuit, Will County, Joliet, Illinois, finding that Joliet violated the Pension Clause by reducing retiree health care benefits. The *Marconi* court did not address the merits of the Pension Clause, but held that the lower court incorrectly decided a constitutional issue—the Pension Clause—without first attempting to decide the case on non-constitutional grounds. *Marconi*, 989 N.E.2d at 726. Because the Illinois Appellate Court reversed the lower court's holding in *Marconi*, and because Plaintiffs here have not provided this court a copy of the unpublished lower court order on which they claim to rely, this court is unable to consider or evaluate the reasoning of the Circuit Court for the Twelfth Judicial Circuit, Will County, Joliet, Illinois, in *Marconi*.

[6] The court is aware that *Maag* v. *Quinn* (*sub. nom.*, *Kanerva* v. *Weems*, Illinois Supreme Court, Docket No. 115811) has been fully briefed and was argued before the Illinois Supreme Court on September 18, 2013. Although this court in such a circumstance would ordinarily defer its determination until the Illinois Supreme Court provides a dispositive interpretation of the Pension Clause, the City is planning to begin discontinuing coverage on January 1, 2014, and Plaintiffs have asked this court for an accelerated ruling to provide guidance for retirees who may, as a result of this court's decision, need to seek health care coverage through the new exchanges provided by the federal government. (Dkt. No. 51.)

Because the question has not yet been ruled on by the Illinois Supreme Court, the duty of this court is to predict, as best it can, how the Illinois Supreme Court would interpret the Illinois Constitution on this point. *Allstate Ins. Co.* v. *Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). In the absence of guiding decisions by the state's highest court, a federal court is to adhere to the decisions of intermediate appellate courts unless there is a convincing reason to predict that the state's highest court would disagree. *ADT Sec. Servs., Inc.* v. *Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012) (relying on *Fidelity Union Trust Co.* v. *Field,* 311 U.S. 169, 177–78 (1940)).

Under Illinois law, the meaning of a constitutional provision rests on the intent of the framers at the time of adoption. *Sayles* v. *Thompson*, 99 Ill. 2d 122, 125, 457 N.E.2d 440, 442 (Ill. 1983) (internal citations omitted). The inquiry must begin with the plain language of the provision itself. *McNamee* v. *State of Illinois*, 173 Ill. 2d 433, 150, 672 N.E.2d 1159, 1162 (Ill. 1996). Where the text alone does not divulge the framers' full intent, the court must examine the legislative history. *Id.* Because the Pension Clause was proposed on the floor of the Illinois Constitutional Convention of 1970 and adopted without a formal hearing or report, the most relevant history is the transcript from the framers' debate on the provision. *Id.*; *Cincinnati Ins. Co.* v. *Chapman*, 181 Ill. 2d 65, 79-80, 691 N.E.2d 374, 381 (Ill. 1998); *Peters* v. *City of Springfield*, 57 Ill. 2d 142, 151, 311 N.E.2d 107, 112 (Ill. 1974).

A. <u>Plain Language of the Pension Clause</u>

The plain language of the Pension Clause unambiguously protects pension rights from diminishment or impairment. Thus, as an initial matter, the court must determine whether the benefits of a "pension or retirement system" ordinarily include health care benefits. Ill. Const. Art. XIII, § 5.

A pension system is commonly understood to be a plan (or fund) that provides retirement income to employees. For example, the United States Supreme Court observed that the "ordinary meaning" of a pension is "a fixed sum … paid under given conditions to a person following his retirement from services (as due to age or disability) or to the surviving dependents of a person entitled to such a pension." *Rousey* v. *Jacoway*, 544 U.S. 320, 330 (2005) (quoting Webster's Third New International Dictionary 1671 (1981)). A pension system does not, by contrast, ordinarily include health care benefits. As an additional example, Congress, when it enacted the Employment Retirement Income Security Act (ERISA), recognized two distinct types of employee benefit plans: welfare plans and pension plans. Welfare plans provide "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . ." 29 U.S.C. § 1002(1). Pension plans, on the other hand, provide "(i) retirement income to employees, or (ii) result in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . ." 29 U.S.C. § 1002(2)(A). Under Illinois law, the purpose of a pension appears to be no different. *See In re Marriage of David*, 367 Ill. App. 3d 908, 914, 856 N.E.2d 1158, 1163 (Ill. App. Ct. 2d Dist. 2006) (quoting Black's Law Dictionary 1134 (6th ed. 1990) ("The term 'pension' means 'retirement benefit paid regularly (normally, monthly), with the amount of such based generally on length of employment and amount of wages or salary of pensioner.'")).

The distinction between pension benefits and health care benefits is apparent when considering the budgetary planning required for each benefit. An employer can plan for its pension liabilities with actuarial certainty, whereas the cost of health insurance fluctuates with the health care market. Congress recognized the need to provide employers with flexibility to adjust health care benefits when it rejected automatic vesting of welfare plans under ERISA. As the United

States Court of Appeals for the Second Circuit in New York explained:

> Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables. Actuarial decisions concerning fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in the cost of treatment independent of inflation. These unstable variables prevent accurate prediction of future needs and costs.

*Moore* v. *Met. Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir. 1988).

In *Maag* v. *Quinn*, the Circuit Court for the Seventh Judicial Circuit, Sangamon County, Springfield, Illinois, relied on similar reasoning to conclude that health care coverage provided by the State of Illinois is not a "benefit" within the meaning of the Pension Clause. (Dkt. No. 34-2, pp. 3-5.) The court observed that pension benefits take the form of income, are paid from protected pension funds, and are fixed at the time of retirement based on a formula that considers, among other factors, length of service and salary during employment. *Id.* at 3. The cost of health care coverage, by contrast, depends largely on factors that cannot be forecast using actuarial analysis, such as changing medical technology, increases in costs of treatment, and the willingness of an insurance provider to offer a particular plan. *Id.* at 4-5. The uncertain nature of health care costs led the *Maag* court to conclude that health care benefits are not the same as a pension, and thus are not protected by the Pension Clause. *Id.* at 5.

Plaintiffs apparently do not disagree that pension benefits are distinct from health care benefits. Plaintiffs argue instead that the Pension Clause, as adopted in 1970, protects more than pension benefits. First, Plaintiffs erroneously argue that "the body of the provision doesn't mention the word 'pension' at all," and its protections cannot be limited to pensions. (Dkt. No. 49, p. 10.) This argument is plainly erroneous and appears to be the result of Plaintiffs' failure to properly quote the provision by simply omitting the word "pension." To quote it again, the Pension

15

Clause, Article XIII, § 5 states in full:

> Membership in any *pension* or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired.

Ill. Const. Art. XIII, § 5 (emphasis added).

Second, Plaintiffs assert that the title of the Pension Clause, "Pension and Retirement Rights," necessarily implies that the Pension Clause protects more than just pension benefits.[7] Third, Plaintiffs contend the Pension Clause protects all the benefits of *membership* in a pension or retirement system, which include more than the payments provided by the pension or retirement fund.[8] Because the plain language of the Pension Clause does not provide an answer to Plaintiffs' latter two arguments, the court must examine the legislative history of the provision.

B. <u>Legislative History of the Pension Clause</u>

The Illinois Supreme Court has on several occasions reviewed the 1970 debates of the Sixth Illinois Constitutional Convention (the "Convention"), and has concluded that the primary purpose of the Pension Clause was to eliminate the uncertainty surrounding public pension benefits at the time. *McNamee*, 672 N.E.2d at 1162. Traditionally, Illinois and its municipalities classified pension plans as either mandatory or optional. Under Illinois law, if an employee's

---

[7] Plaintiffs decline to apply this argument to the text of the Pension Clause, which protects the benefits of "any pension *or retirement system*." Ill. Const. Art. XIII, § 5 (emphasis added). The court will nevertheless consider whether the framers' decision to include "retirement system" in the body of the Pension Clause implies that they intended the Pension Clause to protect more than pension benefits.

[8] Plaintiffs occasionally refer to the benefits of "membership"—the term in the Pension Clause—as benefits of "participation." The court will consider the terms to be synonymous unless a distinction is drawn.

participation in a pension plan was mandatory, the rights of the relationship were considered in the nature of a gratuity that could be revoked at will. *Id.* at 1162 (internal citations omitted); *see also* 4 Record of Proceedings, Sixth Illinois Constitutional Convention 2925 (comments of Delegate Henry Green) ("Illinois courts have generally ruled that pension benefits under mandatory participation plans were in the nature of bounties which could be changed or even recalled as a matter of complete legislative discretion.").

Where an employee's participation in a pension plan was optional, the pension rights were considered enforceable under contract principles. *McNamee*, 672 N.E.2d at 1162. The purpose of the Pension Clause was to guarantee that all pension plans—mandatory and optional—would be interpreted under contract theory rather than treated as "bounties" or "gratuities." *Buddell* v. *Bd. of Trs., State Univ. Ret. Sys. of Ill.*, 118 Ill. 2d 99, 102, 514 N.E.2d 184, 186 (Ill. 1987) (internal citations omitted). By declaring all pension plans contractual in nature, the Pension Clause eliminated any uncertainty as to whether state and local governments were obligated to pay accrued pension benefits to their employees. *See Sklodowski*, 695 N.E.2d at 377; *McNamee*, 672 N.E.2d at 1162-63.

   i.    *"Retirement Rights" and "Retirement System"*

Plaintiffs' first argument, that textual references to "Retirement Rights" and "retirement system" in the Pension Clause, Ill. Const. Art. XIII, § 5, imply protection for more than pension benefits, is not supported by the record of the Convention. Although each word, clause, or sentence in the 1970 Illinois Constitution must, if possible, be given some reasonable meaning, *see Hirschfield* v. *Barrett*, 40 Ill. 2d 224, 230, 239 N.E.2d 831, 835 (Ill. 1968), the record of the debate on the Pension Clause makes clear that the drafters intended for the phrase "retirement system" to mean the same thing as a pension fund or pension system. In 1968, two years before

17

the Convention, Illinois and its municipalities operated 374 different pension funds. 4 Proceedings 2925 (comments of Delegate Henry Green). These were, as one delegate declared, the "retirement systems of the state" and local governments. 4 Proceedings 2929 (comments of Delegate John Parkhurst). The purpose of the Pension Clause was to ensure that the State and local governments honored their obligations to retirees, regardless of the name of their particular pension fund, pension plan, or retirement system. *See* 4 Proceedings 2925 (comments of Delegate Henry Green) (describing how the provision would protect classic pension payments under "one state university retirement system").

Moreover, as early as 1963, the General Assembly used the terms "pension fund" and "retirement system" interchangeably throughout the Pension Code. For example, the provision that establishes pension funds as separate legal entities defines "pension fund" as:

> Any annuity and benefit fund, annuity and retirement fund or retirement system, . . . and by whatever name such annuity and benefit fund, annuity and retirement fund or retirement system may be called, is hereby declared to be a pension fund and to be a body politic and corporate under the title . . . .

1963 Ill. Laws 161. Another section of the Pension Code, also adopted in 1963, defines "retirement system" as "[a]ny pension fund or retirement system governed by Articles 1 to 18, inclusive, of the 'Illinois Pension Code', approved March 18, 1963, as amended." 40 ILCS 5/22A-104.

Based on the framers' comments at the Convention, the language of the Pension Code at the time of the Convention, and Plaintiffs' failure to provide any authority contradicting the record available to the court, the court concludes that the framers at the Convention intended the phrase "retirement system" to mean the same thing as pension fund or pension system in the 1970 Illinois Constitution.

18

ii.     Benefits of "Membership" or "Participation"

Plaintiffs next argue that by protecting the benefits of *membership* (or participation) in a pension fund, rather than merely the benefits *provided* by a pension fund, the Pension Clause accords protection to any benefit arising from membership in a pension fund or retirement system, including health care benefits. Plaintiffs do not argue that the framers intended such an interpretation of the Pension Clause, but because the meaning of a constitutional provision depends on the intent of the framers at the time of adoption, the court must consider the record underlying the Pension Clause notwithstanding Plaintiffs' failure to do so.

In 1987, the Illinois Supreme Court held that the 1970 Illinois Constitution's framers intended for the rights contained within the Pension Code on the effective date of the Pension Clause to become contractual in nature. *Buddell*, 514 N.E.2d at 187-88 (concluding that the right to purchase pension credit for military service, which was contained within the Pension Code on the effective date of the 1970 Illinois Constitution, was protected by the Pension Clause). In 1970, all of the rights enumerated within the Pension Code related to the fixed retirement income that retirees would ultimately receive from a pension or retirement system. The Pension Code, at the time, contained no provisions addressing health care benefits or other benefits that might in the future be conferred upon retirees. Accordingly, the Pension Code, as it existed at the drafting of the Pension Clause, does not support the argument that the framers intended to protect more than the retirement income classically associated with a pension.

The debates of the 1970 Constitutional Convention reflect a similar intent: the framers were "primarily concerned with assuring members of pension plans that they would receive the money due them at the time of their retirement." *People ex rel. Ill. Fed'n of Teachers, et al.* v. *Lindberg*, 60 Ill. 2d 266, 271, 326 N.E.2d 749, 751 (Ill. 1975). Delegate Helen Kinney, who

19

proposed the provision at the Convention, described the benefits entitled to protection:

> Benefits not being diminished really refers to this situation: If a police officer accepted employment under a provision here he was entitled to retire at two-thirds of his salary after twenty years of service, that could not subsequently be changed to say he was entitled to only one-third of his salary after thirty years of service, or perhaps entitled to nothing.

4 Proceedings 2929. The 1970 Illinois Constitution's debate transcripts contain no mention of health care benefits. Nor do the debate transcripts provide any evidence that the delegates intended the Pension Clause to protect future, unenumerated benefits of retirement. In fact, one delegate argued against adopting the Pension Clause precisely because it failed to account for the possibility that ordinary retiree benefits might change in the future:

> [Competition] might make the words "pension" and "retirement" as anachronistic as the Model T Ford fifty years from today. There might be completely new types of systems. To freeze this in the constitution might hurt the very, very people that we are trying to help at this time.

4 Proceedings 2928 (comments of Delegate Ted Borek).

On this record, the court predicts that the Illinois Supreme Court would find the 1970 Illinois Constitution's framers did not intend the Pension Clause to protect all the varying benefits arising from "membership" in a pension fund. Rather, the framers intended to accord protection to the benefits set forth by the General Assembly in the Pension Code.

C. Pertinent Case Law

Considering pertinent case law outside of Illinois, Plaintiffs urge this court to follow state supreme court decisions from Hawaii and Alaska that conclude a retiree's health care benefits are protected by those respective states' constitutional provisions. *See Everson* v. *Hawaii*, 228 P.3d 282 (Haw. 2010); *Duncan* v. *Retired Pub. Emps. of Alaska, Inc.*, 71 P.3d 882 (Alaska 2003). The City contends that this court should follow the New York Court of Appeals, which held that

20

health care coverage, within the meaning of New York's pension provision, is not a protected "benefit." *Lippman* v. *Bd. of Educ. of the Sewanhaka Cent. High Sch. Dist.*, 487 N.E.2d 897 (N.Y. 1985). In *Maag* v. *Quinn*, the Circuit Court for the Seventh Judicial Circuit, Sangamon County, Springfield, Illinois, considered these same cases and followed the reasoning of *Lippman*. (Dkt. No. 34-2, 4.) Because *Everson* and *Duncan* rely on legislative history that is dissimilar to the history of Illinois's Pension Clause, and because Illinois modeled its Pension Clause after New York's, this court agrees with the decision of the *Maag* court to follow *Lippman*.

In *Everson*, the Supreme Court of Hawaii concluded that retiree health care benefits were protected by a provision in the Hawaii Constitution. The Hawaii provision provides: "Membership in any employees' retirement system . . . shall be a contractual relationship, the accrued benefits of which shall not be diminished or impaired." Haw. Const. art. XVI, § 2 (the "Hawaii Clause"). After exhaustively reviewing the legislative history underlying the Hawaii Clause, the court held that the framers of the Hawaii Constitution intended to protect the benefits of membership in a retirement system, not merely the benefits provided by the system. *Everson*, 228 P.3d at 296. Moreover, according to the Supreme Court of Hawaii, the framers intended to permit the legislature to change the form of the retirement system for future employees. *Id.* The court concluded that the legislature did, in fact, change the system and did so "to prevent a diminishment of existing health benefits for public employees and retirees." *Id.* at 296-97 (internal citations omitted). As the City points out, the Hawaii court's conclusion is based in large part on legislative history that is not present in Illinois's Convention debates. The Illinois framers did not authorize the General Assembly to extend constitutional protection to additional benefits in the future. Thus, the decision from Hawaii is distinguishable, and this court predicts

21

would not persuade the Illinois Supreme Court.

In *Duncan*, the Alaska Supreme Court interpreted a constitutional provision nearly identical to that of Hawaii's. Although health care benefits were not provided by retirement systems when the Alaska Constitution was drafted and ratified, the Alaska court's review of the legislative history revealed that "whatever benefits might be provided by state retirement systems were meant to be covered." *Duncan*, 71 P.3d at 887. Moreover, because Alaska's case law suggested that "accrued benefits" should be defined broadly, the court held that the constitutional provision protects all retirement benefits—including health care benefits—that make up the "retirement benefit package" for which an employee contracts when he or she is hired. *Id.* at 887-88. As discussed at length above, the 1970 Illinois Constitution's framers did not intend the Illinois Pension Clause to protect "whatever benefits might be provided" at some point in the future. Therefore, the Alaska Supreme Court's decision in *Duncan* does not provide a persuasive basis for this court to hold that health care benefits are protected by the Illinois Pension Clause.

The *Maag* court, applying the reasoning of the New York Court of Appeals in *Lippman*, concluded that Illinois's Pension Clause does not protect health care benefits. (Dkt. No. 34-2, 4.) Unlike Hawaii and Alaska, article V, section 7 of the New York Constitution (the "New York Pension Clause") served as the model for Illinois's Pension Clause. 4 Proceedings 2925 (comments of Delegate Henry Green) ("our language is that language that is in the New York Constitution"). For this reason, Illinois courts have often referred to New York decisions for guidance. *See, e.g.*, *Felt* v. *Bd. of Trs. of Judges Ret. Sys.*, 107 Ill. 2d 158, 163-64, 481 N.E.2d 698, 700 (Ill. 1985). This court believes the Illinois Supreme Court would be inclined to do so again if presented with the arguments in this case.

In *Lippman*, an employee challenged a resolution of the Board of Education that reduced

22

the school district's contribution to retiree health premiums from 100 percent to 50 percent. Like Illinois, New York law instructed that any contribution required to be made by a retiree should be deducted from the individual's retirement allowance. *Lippman*, 487 N.E.2d at 898. Consistent with the plain language of the New York Pension Clause and the intent of its drafters, the highest court of New York determined that "more than an incidental relationship to the retirement system must be found before an employee benefit will be held to be within the area of action prohibited by the [New York Pension Clause]." *Id.* at 899. Instead, there must be a "direct relationship" or a "real and important nexus" to retirement benefits. *Id.* at 900. The only relation between health care benefits and retirement benefits, according to court, was "the purely incidental one that the latter provides the means by which the former is paid in those instances where the employer has elected to pay less than the full premium." *Id.* Consequently, the *Lippman* court determined that the subsidy retirees received from the school district to pay for health care benefits was "not a benefit of membership in the retirement system," but rather "a benefit that comes to a retired employee . . . because he or she was an employee of the State of New York." *Id.*

The decision in *Lippman*, in conjunction with the plain language of the Pension Clause, the debates at the Convention, and the history of the Pension Code, persuade this court that the Illinois Supreme Court would determine that the Pension Clause does not protect health care benefits.

D. Codification of Health Care Benefits in the Pension Code

Finally, Plaintiffs attempt to distinguish their claims from those of the plaintiffs in *Maag*

on the ground that health care benefits for City employees, unlike state employees,[9] are codified in the Pension Code. Plaintiffs here claim that any benefits provided in the Pension Code, including those benefits established after the effective date of the 1970 Illinois Constitution, are benefits entitled to protection under the Pension Clause. Accordingly, Plaintiffs contend that when the General Assembly amended the Pension Code to address retirees' health care coverage, the benefits conferred became protected by the Pension Clause. Plaintiffs assert that Illinois law is "absolutely certain" on this point, relying exclusively on the Illinois Supreme Court's decision in *Buddell* v. *Board of Trustees*, 118 Ill. 2d 99, 514 N.E.2d 184 (Ill. 1987).

As discussed above, *Buddell* does not provide the support Plaintiffs claim. In *Buddell*, the Illinois Supreme Court determined that rights conferred by the Pension Code on the effective date of the Pension Clause became contractual in nature. *Id.* at 187. The Illinois Supreme Court in *Buddell* did not, as Plaintiffs claim, hold that rights conferred by the Pension Code *after* the adoption of the Pension Clause are similarly entitled to constitutional protection. To the contrary, the Illinois Supreme Court has held that codification in the Pension Code, on its own, is not sufficient to create a right protected by the Pension Clause. *See Sklodowski*, 695 N.E.2d at 379 (holding that location of funding provision in the Pension Code gave no indication of a legislative intention to establish a contractual right).

The provisions of the Pension Code enacted after July 1, 1971, the effective date of the 1970 Illinois Constitution, are subject to the same principles of Illinois law as all other statutory provisions, "the presumption . . . that laws do not create private contractual or vested rights, but

---

[9]    In *Maag*, the Circuit Court of Sangamon County, Illinois, addressed health care benefits for state employees, which are set forth in the State Employee Group Insurance Act, 5 ILCS 3751 (2012). (Dkt. No. 34-2.)

merely declare a policy to be pursued until the legislature ordains otherwise." *Sklodowski*, 695 N.E.2d at 379 (quoting *Fumarolo* v. *Chicago Bd. of Educ.*, 142 Ill. 2d 54, 104, 566 N.E.2d 1283, 1305 (Ill. 1990), quoting *National R.R. Passenger Corp.* v. *Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 466 (1985), quoting *Dodge* v. *Bd. of Educ.*, 302 U.S. 74, 79 (1937)). Unless the legislature has clearly indicated that it intends for a law to create a contractual relationship, no such relationship exists. *Dopkeen* v. *Whitaker*, 399 Ill. App. 3d 682, 685-86, 926 N.E.2d 794, 798 (Ill. App. Ct. 1st Dist. 2010) (citing *Fumarolo*, 566 N.E.2d at 1283).

Here, Plaintiffs rely on a series of statutory provisions added to the Pension Code between 1983 and 2003, well after July 1, 1971, the effective date of the Pension Clause.[10] The City argues, and the court agrees, that the plain language of the provisions refutes any contention that the General Assembly intended the provisions to confer "benefits" entitled to contractual protection under the Pension Clause. In fact, with one exception, each statutory provision explicitly confirms the opposite, *i.e.*, that the provision was *not* intended to create a "benefit" for purposes of the Pension Clause. For example, the 1985 provision addressing health care coverage for members of the Municipal Fund states:

> The group hospital care plan and group medical and surgical plan established under this Section are not and shall not be construed to be pension or retirement benefits for purposes of [the Pension Clause].

40 ILCS 5/8-164.1 (added by P.A. 84-23, § 1, eff. July 18, 1985). Each of the Pension Code

---

[10]  *See* 40 ILCS 5/5-167.5 (added by P.A. 82-1044, § 1, eff. Jan. 12, 1983); 40 ILCS 5/6-164.2 (added by P.A. 82-1044, § 1, eff. Jan. 12, 1983); 40 ILCS 5/11-160.2 (added by P.A. 84-159, § 1, eff. Aug. 16, 1985); 40 ILCS 5/8-164.1 (added by P.A. 84-23, § 1, eff. July 18, 1985); collectively amended by: (P.A. 86-273, § 1, eff. Aug. 23, 1989); (P.A. 90-32, § 5, eff. June 27, 1997); (P.A. 92-599, § 10, eff. June 28, 2002); (P.A. 93-42, § 5, eff. July 1, 2003); (P.A. 98-43, § 5, eff. June 28, 2013).

amendments enacted thereafter contains nearly identical language confirming the General Assembly's express intent not to create additional benefits entitled to constitutional protection. *See* 40 ILCS 5/8-164.1; 40 ILCS 5/5-167.5; 40 ILCS 5/6-164.2; 40 ILCS 5/11-160.2 (amended by P.A. 86-273, § 1, eff. Aug. 23, 1989); (P.A. 90-32, § 5, eff. June 27, 1997); (P.A. 92-599, § 10, eff. June 28, 2002); (P.A. 93-42, § 5, eff. July 1, 2003); (P.A. 98-43, § 5, eff. June 28, 2013).

The original 1983 provisions, which addressed health care coverage for members of the Policemen's and Firemen's Funds, did not include language expressly stating that health care benefits were not pension or retirement benefits for purposes of the Pension Clause. *See* 40 ILCS § 5/5-167.5; 40 ILCS § 5/6-164.2 (added by P.A. 82-1044, § 1, eff. Jan. 12, 1983). But the 1983 provisions similarly provided no evidence that the General Assembly intended to create a contractual right to health care benefits. *Id.* Plaintiffs offer no argument to the contrary, and rely solely on the statutory location of the provisions in the Pension Code rather than the text of the provisions. Accordingly, under Illinois law, the 1983 provisions lacked the clear legislative intent required to create a vested right. *See* 40 ILCS § 5/5-167.5; 40 ILCS § 5/6-164.2 (added by P.A. 82-1044, § 1, eff. Jan. 12, 1983).

In sum, this court believes the Illinois Supreme Court would hold that neither the Pension Clause nor the various statutory provisions in the Pension Code extend constitutional protection to health care benefits. Consequently, Count I of Plaintiffs' Amended Complaint must be dismissed for failure to state a claim on which relief may be granted.

II.    Plaintiffs' Breach of Contract Claim (Count II)

Plaintiffs allege in Count II of their Amended Complaint (Dkt. No. 55) that by requiring Plaintiffs to pay increased health care premiums, the City has breached its contract to provide Plaintiffs with "fixed-for-life subsidized healthcare premiums in effect on their retirement date."

26

(Am. Compl. ¶¶ 117-18.) Plaintiffs assert two bases in support of their position: (1) Plaintiffs have a contractual right "as per the [Pension Clause]" and (2) under common law principles of contract, the Korshak and Window subclasses have a contractual right to the plan in effect during the period between October 1, 1987 to August 23, 1989, at the $55/21 "fixed-rate-for-life healthcare premiums," subsidized entirely by their respective Pension Funds. (*Id.*)

As discussed above, the Pension Clause does not create a contractual right to health care benefits and thus cannot form the basis for Plaintiffs' breach of contract claims. The City argues that Plaintiffs' claim under common law principles of contract must also be dismissed because Plaintiffs have failed to plead the existence of a valid and enforceable contract, and because the claim is barred by the Statute of Frauds to the extent Plaintiffs rely on oral statements of City employees. 740 ILCS 80/1 (added by R.S.1874, p. 540, § 1, eff. July 1, 1874).

In response to the City's first argument, Plaintiffs assert that "[p]ast rulings by the courts are probably collateral estoppel against the City's motion to dismiss claims for contract . . . ." (Dkt. No. 49, p. 5.) Specifically, Plaintiffs claim that because they survived a motion to dismiss similar claims in the original Korshak Litigation, the City should be estopped from obtaining dismissal of Plaintiffs' purportedly related contract claims now more than 25 years later. As the City notes, this argument fails as a matter of law. Collateral estoppel requires a final judgment on the merits. *Kalush* v. *Deluxe Corp.*, 171 F.3d 489, 493 (7th Cir. 1999). In Illinois, the denial of a motion to dismiss simply does not constitute a final judgment on the merits. *See, e.g.*, *State Farm Mut. Auto. Ins. Co.* v. *Illinois Farmers Ins. Co.*, 226 Ill. 2d 395, 414, 875 N.E.2d 1096, 1099 (Ill. 2007).

Nevertheless, the court believes that, at the very least, the 1988 ruling referenced by Plaintiffs might prove informative to the court's evaluation of Plaintiffs' contract claim in Count

II of their Amended Complaint. First, Judge Albert Green's oral ruling in *City of Chicago* v. *Korshak*, Circuit Court of Cook County, Illinois Chancery Div. No. 87 CH 10134, from which Plaintiffs quote at length, only finds that the litigants in the Korshak Litigation sufficiently pleaded causes of action "sounding in breach of contract." (Dkt. No. 49, p. 7.) Judge Green's ruling, according to the excerpt provided by Plaintiffs, does not state any of the alleged facts he relied upon to make his finding. Plaintiffs similarly have not provided this court with the facts alleged in the Korshak Litigation that might support their common law contract claim here. In their Amended Complaint, Plaintiffs simply allege, in a conclusory manner without any supporting detail, that a contract exists. (Am. Compl. ¶¶ 10(a), 117.) Allegations that amount to nothing more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," are not sufficient. *Twombly,* 550 U.S. at 555. In their response to the City's motion to dismiss, Plaintiffs had another opportunity to clarify the alleged facts which give rise to their contract claim. Plaintiffs inexplicably declined to do so. Instead, Plaintiffs' entire response to the City's argument is their erroneous claim that Judge Green's 1988 ruling is "probably" collateral estoppel, followed by three and a half pages of quotes from Judge Green's ruling, none of which establish the facts underlying Plaintiffs' contract claim. (*See* Dkt. No. 49, pp. 6-9.)

Without the benefit of better guidance from Plaintiffs, the court is unable to find enough factual content to draw the plausible inference that Plaintiffs had a contractual right to "fixed-rate-for-life health care premiums." *See Iqbal*, 556 U.S. at 678. The only provisions that might plausibly allow the court to infer the existence of a contract are the alleged "handshake" agreement between the Byrne administration and the Police and Fire Unions which led to the 1983 amendments to the Pension Code, (Am. Compl. ¶¶ 26, 27), and the oral statements of City employees at the alleged "Pre-Retirement Seminars," (Am. Compl. ¶¶ 45-48).

28

As for the alleged "handshake" agreement with the Byrne administration, Plaintiffs concede that it was memorialized as the 1983 statutory amendments to the Pension Code. (Am. Compl. ¶¶ 26, 27.) As discussed above, however, because this provision lacks the requisite showing of intent to create a contractual relationship, it cannot form the basis for a breach of contract claim.

As for the oral statements of City employees, the City correctly argues the claim is barred by the Statute of Frauds. Plaintiffs declined to respond to the City's argument regarding the Statute of Frauds because, in Plaintiffs' view, the Statute of Frauds—or perhaps the entire breach of contract claim—is "decidedly [a] side issue[] to the main event here."[11]  (Dkt. No. 49, p. 18.)

Illinois law provides that "no action shall be brought upon any agreement that is not to be performed within the space of one year from the making thereof, unless in writing and signed by the party to be charged." 740 ILCS 80/1. In *McInerney* v. *Charter Golf, Inc.*, 176 Ill. 2d 482, 680 N.E.2d 1347 (Ill. 1997), the Illinois Supreme Court held that an "employment-for-life" contract cannot be performed within one year and is thus subject to the Statute of Frauds. *Id.* at 1352. The City argues that the same reasoning applies to a purported contract for fixed-rate-for-life health care premiums. Therefore, according to the City, oral promises of free, lifetime health care benefits, allegedly made by a number of unnamed City officials, cannot meet the requirements set forth in the Statute of Frauds and cannot form the basis of a contractual right to health care benefits. The court agrees with the City, and Plaintiffs provide no authority to the contrary which

---

[11]  Plaintiffs declined to address a number of arguments put forth by the City in its motion to dismiss because Plaintiffs said "time is short." (Dkt. No. 49, p. 18.) The court had granted Plaintiffs two extensions of time to file their response. (Dkt. Nos. 42, 48.) Plaintiffs sought no more.

results in a waiver on the point. *See, e.g.*, *Cincinnati Ins. Co.* v. *E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2011) (a party's failure to oppose an argument permits an inference of acquiescence, and "acquiescence operates as a waiver").

Because Plaintiffs have failed to plead sufficient factual content to state a claim for breach of contract, on either constitutional or common law grounds, Count II of the Amended Complaint must dismissed.

III.   Plaintiffs' Equitable Estoppel Claim (Count III)

In Count III, Plaintiffs allege that "the City and the Pension Funds are estopped by their own conduct from changing or terminating the annuitant coverage to a level below the highest level of benefit during a participant's participation in the group healthcare benefits." (Am. Compl. ¶ 121.) Plaintiffs also allege that the City is estopped from making any changes or terminating health care coverage for retirees without providing the Pension Funds a reasonable window to obtain coverage through another provider. (*Id.* ¶ 122.) Although Plaintiffs fail to articulate the specific type of their claim's alleged estoppel, Plaintiffs' response to the City's motion to dismiss makes clear that Count III purportedly sounds in equitable estoppel. (Dkt. No. 49, pp. 5-9.)

To state a claim for equitable estoppel, Plaintiffs must plead specific facts to show: (1) an affirmative act by either the municipality itself or an official with express authority to bind the municipality; and (2) reasonable reliance upon that act by Plaintiffs that induces Plaintiffs to detrimentally change their position. *Patrick Eng'g, Inc.* v. *City of Naperville*, 2012 IL 113148, ¶ 40, 976 N.E.2d 318, 331 (Ill. 2012). Moreover, estoppel against a public body is not favored, particularly when public revenues are at stake. *Id.* at 332.

The City argues that Plaintiffs' Amended Complaint fails to allege any affirmative act by

the City itself, thus failing the first prong of the test set forth in *Patrick Engineering*. In response to the City's argument, Plaintiffs present the same erroneous argument they made in support of their ill-fated purported contract claim of Count II, that "[p]ast rulings by the courts are probably collateral estoppel against the City's motion to dismiss claims for . . . estoppel." (Dkt. No. 49, p. 5.) As with the contract claim, Plaintiffs rely completely on Judge Green's findings that Plaintiffs—in a different litigation, in a different court, in 1988—adequately stated a claim for equitable estoppel. Again, however, the transcript of Judge Green's ruling does not reveal the facts underlying Judge Green's determination on this point.

Plaintiffs' Amended Complaint on this point is defective because it is devoid of any allegations of affirmative acts by officials with express authority to bind the City. Plaintiffs allege that the City presented a series of "Pre-Retirement Seminars" from 1984 to 1987 for employees who were nearing retirement. (Am. Compl. ¶ 45.) Plaintiffs also allege that "City officials of the Health and Benefits Office were present" at the seminars to explain the terms of health care coverage for retirees. (*Id.* ¶ 46.) Plaintiffs never allege, however, that any of these City officials possessed express authority to bind the City. Illinois courts acknowledge that, on occasion, a plaintiff may be forced to allege express authority upon information and belief because, without the benefit of discovery, a plaintiff may not know the details of a municipality's hierarchy. *Patrick Eng'g, Inc.*, 976 N.E.2d at 332. That is not the case here. Plaintiffs have failed to allege or argue that, even if they were given a reasonable opportunity for investigation or discovery, *see* Fed. R. Civ. P. 11(b)(3), their factual contentions would likely have evidentiary support to prove that the City officials meeting with the potential retirees from 1984 to 1987 had express authority to bind the City. More importantly, as Plaintiffs concede in their Amended Complaint, similar claims were asserted in 1988. (Am. Compl. ¶ 2.) Consequently, despite the

31

fact that the intervening twenty-five years should have allowed a sufficient opportunity for investigation, Plaintiffs still cannot identify any City officials who purportedly possessed the requisite express authority to bind the City on this point.

Because Plaintiffs have failed to sufficiently allege an affirmative act by the City, or by an individual with express authority to bind the City, the court need not consider whether Plaintiffs have alleged facts sufficient to establish reasonable reliance by Plaintiffs to their detriment. *See Patrick Eng'g, Inc.*, 976 N.E.2d at 331. Plaintiffs have failed to state a claim for equitable estoppel and Count III of the Amended Complaint must be dismissed.

IV.  Plaintiffs' § 1983 Claim (Count IV)

Plaintiffs assert in support of Count IV, their § 1983 claim, that they have "a property right to a lifetime healthcare plan, unreduced from the best terms during a person's participation in one of the retirement funds." (Am. Compl. ¶ 124.) Consequently, Plaintiffs argue that each health care premium charged by the City in excess of the person's "best entitled premium," constitutes a deprivation of a property right secured under the Fourteenth Amendment and actionable under 42 U.S.C. § 1983. (*Id.* ¶ 125.)

To state a claim under § 1983, Plaintiffs must present facts sufficient to show that the City, acting under color of state law, deprived Plaintiffs of a specific right or interest secured by the United States Constitution or the laws of the United States. *See* 42 U.S.C. § 1983; *Payne* v. *Churchich*, 161 F.3d 1030, 1039 (7th Cir. 1998) (internal citations omitted). Property interests, however, are not created by the United States Constitution. "Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Moore* v. *Muncie Police & Fire Merit Comm'n*, 312 F.3d 322, 326

(7th Cir. 2002) (citing *Bd. of Regents* v. *Roth*, 408 U.S. 564, 577 (1972)) (internal quotations omitted). Because the court has determined that the Illinois Supreme Court would hold that Plaintiffs do *not* have a right to lifetime health care benefits under the Pension Clause, common law contract, or equitable estoppel, Plaintiffs have no protected property right secured by the Fourteenth Amendment and actionable under § 1983.

Plaintiffs cite a number of cases purportedly holding that retirees may rely on § 1983 to obtain relief when a local government reduces retirement benefits. (Dkt. No. 49, p. 18.) None of these cases, however, support a property right in *health care benefits* as Plaintiffs argue in this case. *See Miller* v. *Ret. Bd. of Policemen's Annuity*, 329 Ill. App. 3d 589, 771 N.E.2d 431 (Ill. App. Ct. 1st Dist. 2002) (addressing a § 1983 claim involving classic, fixed income pension payments); *Moore* v. *Board of Trs.*, 157 Ill. App. 3d 158, 510 N.E.2d 87 (Ill. App. Ct. 1st Dist. 1987) (addressing neither health care benefits nor § 1983); *Jacobson* v. *Chicago*, 233 F. Supp. 2d 1001 (N.D. Ill. 1992) (Castillo, J.) (declining to rule on whether Korshak annuitants had a property interest actionable under § 1983); *Retired Chicago Police Ass'n* v. *City of Chicago*, 141 F.R.D. 477 (N.D. Ill. 1992) (Conlon, J.) (dismissing association for lack of standing without determining whether retirees possessed a property right in health care benefits actionable under § 1983). Because this court has determined that Plaintiffs do not have a property right in health care benefits, Count IV of Plaintiffs' Amended Complaint must be dismissed.

V.    Plaintiffs' United States Constitutional Claim (Count V)

Finally, Plaintiffs claim that the City and the General Assembly violated the Contracts Clause of the United States Constitution, which provides that "[n]o State shall . . . pass any . . . law impairing the Obligations of Contracts." U.S. Const. Art. I, § 10, c1. 1. A state violates the Contracts Clause if a "change in state law has 'operated as a substantial impairment of a

contractual relationship.'" *Gen. Motors Corp.* v. *Romein*, 503 U.S. 181, 186 (1992) (quoting *Allied Structural Steel Co.* v. *Spannaus*, 438 U.S. 234, 244 (1978)). The court must determine the following as to Plaintiffs' allegations in their Amended Complaint: (1) whether there is a contractual relationship; (2) whether a change in law impairs that contractual relationship; and (3) whether the impairment is substantial. *Id.*

Plaintiffs assert, as they have throughout their Amended Complaint, that the Pension Clause creates a contractual right to health care benefits. (Am. Compl. ¶¶ 131-33.) Plaintiffs also allege that the City violated this contractual right "[b]y increasing the healthcare premiums charged to annuitants, or adversely changing the terms or subsidy . . . ." (*Id.* ¶ 132.) Plaintiffs further allege that the General Assembly violated Plaintiffs' contract with the City by "stripping . . . the Illinois Constitution's protection of group health benefits provided under the Pension Code, by reducing them or re-labeling them as 'not benefits of participation' under P.A. 86-273," and by passing other statutes which impair the contractual rights of participants. (*Id.* ¶ 133.)

As stated earlier in this opinion, this court believes the Illinois Supreme Court would hold that Plaintiffs do not have a contractual right to health care benefits under the Pension Clause or common law contract. Accordingly, Plaintiffs fail to plead sufficient facts to satisfy the threshold element required by the Contracts Clause of the United States Constitution—the existence of a contract—and Count V of Plaintiffs' Amended Complaint must be dismissed.

VI.   Plaintiffs' Claims Against the Pension Funds

Plaintiffs concede that they have named the trustees of the Pension Funds "only for a declaration that they are not permitted to reduce their subsidy for class members from the highest levels enjoyed by each participant." (Am. Compl. ¶ 18.) Because Plaintiffs, according to the court record, have not served the Pension Funds, the Pension Funds did not have an opportunity

to join the City's motion to dismiss. Nevertheless, the declaration Plaintiffs seek depends upon a determination that the Pension Clause protects health care benefits from diminishment or impairment. Because this court has predicted that the Illinois Supreme Court would hold that the Pension Clause does not accord protection to health care benefits, Plaintiffs' claims against the Pension Funds must also be dismissed.

CONCLUSION

For the reasons explained above, the City's motion to dismiss (Dkt. No. 28) is granted as to each of the five purported claims alleged in Plaintiffs' Amended Complaint (Dkt. No. 55). Plaintiffs' allegations against the Pension Funds are also dismissed in their entirety.

The court in making this determination sympathizes with Plaintiffs' concerns, and appreciates that retirees inevitably need health care. The court after carefully considering the matter has, however, determined that the law does not support Plaintiffs' arguments against the City's announced actions. Therefore, Plaintiffs' Amended Complaint is dismissed with prejudice. This is a final appealable order terminating this case in favor of the City, and in favor of the other named defendants, with costs to be awarded under 28 U.S.C. § 1920.

ENTER:

_James F. Holderman_____

JAMES F. HOLDERMAN
District Judge, United States District Court

Date: December 13, 2013